Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff, Eula Elazouzi

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| EULA ELAZOUZI,<br><br>               Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>               Defendants. | Case No.: 5:22-CV-00858-JGB (SPx)<br><br>Action Filed: May 23, 2022<br><br>District Judge **Jesus G. Bernal**<br>Magistrate Judge **Sheri Pym**<br><br>Trial Date: Not Set<br><br>**PLAINTIFF EULA ELAZOUZI'S OPENING TRIAL BRIEF** |



## **TABLE OF CONTENTS**

1.  INTRODUCTION ……………………………………………………1

2.  STATEMENT OF FACTS ……………………………………...4

    A.   The Policy's Terms …………………………………………...4

    B.   Plaintiff's Medical History and the Claims Process ………………5

3.  AETNA IMPROPERLY DENIED PLAINTIFF'S CLAIM …………..13

    A.   Standard of Review……………………………………………13

    B.   Aetna Improperly Relied on the Experimental/Investigational Policy Exclusion ……………………………………………14

        1)   The CPB Does Not Control, and Aetna Improperly Denied Plaintiff's Claim ………………………………………14

        2)   Aetna Did Not Fairly Engage With Plaintiff's Doctors and Did Not Engage in a Meaningful Dialogue With Plaintiff ………20

        3)   Aetna Consistently and Improperly Changed Its Basis for Denying the Claim……………………………………..23

4.  CONCLUSION ……………………………………………..25





# TABLE OF AUTHORITIES

## Cases

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) ......................23

*Collier v. Lincoln Life Assurance Co. of B.*, 53 F.4th 1180 (9th Cir. 2022) ....passim

*D.K. v. United Behavioral Health*, --- F.4th---, 2023 WL 3443353 (10th Cir.
   2023) ........................................................................................................passim

Dowdy v. Metropolitan Life Ins. Co., 890 F.3d 802 (9th Cir. 2018) ......................14

*E.L. v. Scottsdale Healthcare Corp. Health Plan*, 2011 WL 3489644 (D. Az.
   2011) .................................................................................................................19

*Estate of Dick by and through Dick v. Deseret Mutual Benefit Administrators*,
   2023 WL 2071523 (D. Or. 2023) ........................................................................2

*Evans v. Sun Life & Health Ins. Co.*, 601 F.App'x 497 (9th Cir. 2015) ................21

*Harlick v. Blue Shield of California* .....................................................................25

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) ...............................13

*Metaxas v. Gateway Bank F.S.B.*, 2022 WL 3702099 (N.D. Cal. 2022) .........passim

*Silver v. Executive Car*, 466 F.3d 727, 728 (9th Cir. 2006) ...................................13

## Regulations

29 C.F.R. § 2560.503 ...........................................................................................22



## 1.  <u>INTRODUCTION</u>

Plaintiff Eula Elazouzi ("Plaintiff") suffers from a recurring hiatal hernia and severe acid reflux ("GERD").  These conditions are sufficiently severe that, at times, she has suffered from internal bleeding requiring hospitalization.  Her hiatal hernia was previously operated on, and, when the repair "slipped," her doctors performed a second surgery and repaired it.  The repair has slipped yet again.  Her doctors have recommended that she undergo a Roux-en-Y, a form of gastric by-pass surgery.  Plaintiff's doctors believe that the hernia will simply slip again if they perform yet another surgery to repair the initial procedure.  The Roux-en-Y is the safe, effective, medically necessary, and most importantly, it is not considered experimental.  Not only have Plaintiff's doctors all agreed on this medical fact, but a doctor from her insurer, Aetna Life Insurance Company ("Aetna"), strongly agreed with her doctors that this surgery was appropriate and medically necessary for Plaintiff.  Yet, Aetna refused to approve the surgery under Plaintiff's employee benefit plan (the "Plan") that provides Plaintiff's medical insurance (the "Policy").

Plaintiff is required under the Policy to obtain pre-approval of procedures like a Roux-en-Y.  Her doctors submitted a claim for pre-approval (the "Claim").  After participating in a meet-and-confer, Aetna's doctor concluded that the claim should be approved.  Aetna, however, denied it.  Aetna also denied it through subsequent levels of appeals.  Aetna's actions reveal an insurer desperate to deny a claim and searching for a reason why.  Aetna initially denied the claim while alleging that it was unnecessary and experimental/investigational for *weight loss*.  In fact, the treatment was never meant for weight loss; rather, it was meant to remedy a hiatal hernia and GERD.  On appeal, Aetna initially denied the claim as being medically unnecessary, not mentioning whether it considered her procedure as experimental/investigational.  Aetna insisted that the requested information had been omitted although, in fact, the questions raised had already been addressed.  The reviewer had simply failed to review the provided documentation.  Finally, on the



last appeal, Aetna abandoned altogether the argument that the treatment was not medically necessary.  Instead, changing its position midstream, it denied her claim, insisting now that the treatment was experimental and/or investigational.  Each time Aetna denied the claim, it did so in reliance on the Clinical Policy Bulletin ("CPB").  An independent review was performed, but it upheld the denial on a completely different basis.  It erroneously insisted that Plaintiff did not suffer from a hiatal hernia or erosive esophagitis.  In fact, **Aetna had already conceded that she suffers from these conditions**.  This was a completely new basis on which Aetna relied to deny the claim.  Plaintiff was never provided with an opportunity to respond to the final denial of appeal or the third-party reviewer.

Aetna's denial of Plaintiff's claim for benefits was wrong for multiple reasons.  First, the Plan documents provide for approval of the treatment in question and Aetna's own physician recommended that the procedure be approved.  Aetna, however, erroneously insisted that the CPB and its statement that the treatment is experimental or investigational controlled.  Here, the CPB is only incorporated into the Plan for determinations of medical necessity.  *See Estate of Dick by and through Dick v. Deseret Mutual Benefit Administrators*, 2023 WL 2071523, at **4-5 (D. Or. 2023).  The claim was not denied for that reason.  Aetna conceded that the treatment was medically necessary when it denied the final appeal solely on the basis of nothing of it being experimental or investigational.  The Plan provides a five-pronged test to determine whether something is experimental or investigational.  Plaintiff's proposed treatment satisfies all elements of that test and for that reason alone should have been approved.  Even if the CPB was incorporated (which it is not), if the main Plan document is clear, then the CPB would not be consulted.  The Plan document is clear.  Plaintiff is entitled to her medical treatment.

Second, Aetna failed to engage with Plaintiff's treating physicians or provide meaningful communication in its denial letters.  The only doctor to have contacted Plaintiff's treating physicians agreed that the procedure should be approved.



1   Aetna's other doctors never even spoke with Plaintiff's treating physicians.
2   Furthermore, in the denial letters, Aetna failed to adequately explain why the
3   treatment was experimental.  Aetna simply directed Plaintiff to its website, where
4   multiple possibly applicable clinical policy bulletins were present.  Even if Plaintiff
5   had found the correct one, the relevant information was lost somewhere in a 155-
6   page document.  This was no meaningful dialogue with Plaintiff.

7         Third, Aetna consistently changed its basis for denying the Claim.  An insurer
8   who changes the basis of denial, especially when it raises a new basis on the final
9   claim denial, denies the insured the chance to properly engage in the administrative
10  process.  This was highly improper and clear evidence of Aetna's bias to deny the
11  claim and failure to give Plaintiff a full and fair review.  *See Collier v. Lincoln Life*
12  *Assurance Co. of B.*, 53 F.4th 1180 (9th Cir. 2022); *D.K. v. United Behavioral*
13  *Health*, 2021 WL 2554109, at *13 (D. Utah 2021) ("[T]he court finds that the
14  Defendants' shifting and inconsistent denial rationale is arbitrary and capricious.");
15  *Metaxas v. Gateway Bank F.S.B.*, 2022 WL 3702099, at *15 (N.D. Cal. 2022).  The
16  insurer must give the claimant an adequate opportunity to respond to the basis of
17  denial.  Here, Aetna consistently changed the basis of denial.  Initially, it denied the
18  claim for the incorrect treatment of *obesity*, something that Plaintiff never even
19  submitted.  Once Aetna understood the nature of her claim, Aetna denied it for the
20  procedure not being medically necessary.  Then, on the final appeal, it
21  acknowledged that the claim was medically necessary, but denied the claim based
22  on an experimental and/or investigational exclusion.  And further, the third-party
23  assessor denied the claim for yet a different reason: a disagreement about the
24  condition from which Plaintiff suffers.  This constant changing of the basis of denial
25  denied Plaintiff the chance to address Aetna's constantly changing basis of denial.

26        Ultimately, Aetna denied the claim because of its improper emphasis on the
27  CPB.  This Court should reverse Aetna's decision and find in Plaintiff's favor.  She
28  requires this treatment, and the Policy provides for it.



## 2.    **STATEMENT OF FACTS**

### A.    **The Policy's Terms**

The Plan states:

**Experimental or investigational**
Drugs, treatments or tests not yet accepted by **physicians** or by insurance plans as standard treatment. They may not be proven as effective or safe for most people.  A drug, device, procedure, or treatment is **experimental or investigational** if:

> • There is not enough outcome data available from controlled clinical trials published in the peer reviewed literature to validate its safety and effectiveness for the illness or injury involved.
> • The needed approval by the FDA has not been given for marketing.
> • A national medical or dental society or regulatory agency has stated in writing that it is **experimental or investigational** or suitable mainly for research purposes.
> • It is the subject of a Phase I, Phase II or the experimental or research arm of a Phase Ill clinical trial.  These terms have the meanings given by regulations and other official actions and publications of the FDA and Department of Health and Human Services.
> • Written protocols or a written consent form used by a facility **provider** state that it is **experimental or investigational.** (AR:540)

**Medically necessary, medical necessity**
Health care services that we determine a **provider,** exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease or its symptoms, and that we determine are:

> • In accordance with generally accepted standards of medical practice
> • Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease
> • Not primarily for the convenience of the patient, **physician** or other health care **provider**
> • Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease

Generally accepted standards of medical practice means:

• Standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community

• Following the standards set forth in our clinical policies and applying clinical judgment (AR:541)

Regarding Aetna's CPB, the Plan explains that "We use these bulletins and other resources to **help guide individualized coverage decisions** under our plans. You can find the bulletins and other information at *https://www.aetna.com/health-care-professionals/clinical-policy-bulletins.html*." (Emphasis added.) (AR:517) Nowhere in the Plan documents is there a broad incorporation of the CPB into the Plan. The CPB is only incorporated under two headings, one related to medical necessity and the other addressing certain medications. (AR:499, 541)

**B.    Plaintiff's Medical History and the Claims Process**

In 2012, Plaintiff underwent a Nissen fundoplication. (AR:110, 188) This is a surgical procedure for the treatment of acid reflux and a hiatal hernia. For a time, the surgery resolved her health problems, but the problems later returned.

On December 11, 2018, Brian Smith, M.D.[1] performed a second Nissen fundoplication on Plaintiff. Her previous one had "slipped."[2] The surgery was, for a time, a success. (AR:110, 188) In 2019, Plaintiff started to again suffer from chronic epigastric pain, gas, and bloating. Medications did not help. Her chronic epigastric pain, gas, and bloating problems progressively worsened. (AR:113)

---

[1] Dr. Smith is the Co-Director of the Minimally Invasive Surgery Fellowship for the Division of Gastrointestinal Surgery at UC Irvine. (AR:111)

[2] Slipped Nissen fundoplication is the axial movement of the esophagus back into the chest due to poor mobilization. Such axial movement drags the gastroesophageal junction and upper part of the stomach through the fundoplication, hence the term slipped fundoplication. https://houstonheartburn.com/slipped-nissen-fundoplication-why-do-we-still-see-it.

1    Plaintiff's condition continued to deteriorate.  On August 18, 2021, she was

2  admitted to a hospital for feeling sweaty and lightheaded/dizzy.  (AR:113, 131, 135,

3  309)  She suffered from "Upper GI bleeding" and anemia due to acute blood loss.

4  (AR:135)  She underwent an esophagogastroduodenoscopy that showed severe

5  inflammation of the fundoplication, erosive gastritis, erosive duodenitis, erosive

6  esophagitis, and fundoplication on retroflexion.  (AR:167-68)  An upper GI series

7  showed a recurrence of her hiatal hernia.  (AR:181)  A CT scan of her abdomen and

8  pelvis showed sigmoid diverticulosis.  (AR:177)

9    In August 2021, Plaintiff visited Michael Sedrak, M.D.  In a "New Patient

10  Consultation Report," Dr. Sedrak explained that Plaintiff was seeking "treatment

11  options due to the history of gastrointestinal bleed. . . ."  Dr. Sedrak noted that

12  Plaintiff was positive for "constipation, diarrhea, abdominal pain, blood in stool,

13  nausea, vomiting, change in bowel habits, prior abdominal surgery, adhesions and

14  black tarry stools, heartburn, indigestion, regurgitation, GERD related chest pain,

15  GERD-related asthma, and having to use antacids."  He determined that a Roux-en-

16  Y was Plaintiff's best and safest chance at resolving her problems.  (AR:129-30)

17  On August 30, 2021, Dr. Sedrak performed a videofluoroscopy on Plaintiff.  It

18  produced findings consistent with a slipped Nissen fundoplication. (AR:300-08)

19    On September 9, 2021, Plaintiff treated with Eleanor Yang, M.D., a

20  gastroenterologist.  (AR:113, 117)  Dr. Yang determined that Plaintiff suffered from

21  a hiatal hernia with GERD and esophagitis.  (AR:116)  She noted that Plaintiff's last

22  repair of her fundoplication only lasted three years.  Dr. Yang then explained that:

23  
> Given two failed repair/fundoplications is unlikely to have durable
> improvement from another redo.  Given her propensity towards
> recurrent hiatal hernia, discussed a more aggressive anti-reflux
> procedure--namely short-limb Roux-en-Y gastric bypass.  We have
> considered re-do fundoplication versus RYGB, but patient is leaning
> towards RYGB given lower likelihood of success with a re-do and the
> consequences of recurrent hiatal yet again.  (AR:116)

28

Case No.: 5:22-CV-00858-JGB (SPx)



Dr. Smith submitted a preauthorization request to Aetna.  In a letter dated October 8, 2021, Aetna denied the request (the "Claim Denial").  Aetna stated:

> We used the Clinical Policy Bulletin (CPB): Obesity Surgery. Based on CPB criteria and the information we have, we're denying coverage for the requested obesity surgery. **Medical studies have not proven this procedure to be safe and effective to treat your *obesity condition*.** (AR:003) (Emphasis added.).

The decision stated that the treatment was experimental/investigational and not medically necessary for *weight loss*.  (AR:003)  She did not seek weight loss treatment.  She sought this surgery to treat her hiatal hernia and GERD conditions.

The CPB is 155 pages.  Only a few pages address Plaintiff's circumstances. That portion is titled "Gastrojejunostomy for the Treatment of Gastro-Esophageal Reflux Disease following Anti-Reflux Surgery."  (AR:689)  It cites to three studies, all of which support the fact that the treatment is **not experimental/investigational and is medically necessary**.  One study explains that:

> The major anatomic causes of failed fundoplication are slipped fundoplication, failure to identify a short esophagus, and problems with the wrap.  Minimally invasive surgery has become more common for these procedures.  Options for surgery include redo fundoplication with hiatal hernia repair if needed, **conversion to [Roux-en-Y] anatomy**, or, as a last resort, esophagectomy. (AR:689-90) (Emphasis added.)

On October 14, 2021, Richard Morgan, D.O., a physician hired *by Aetna* to review Plaintiff's claim, spoke with Dr. Smith.  He documented that conversation with a note in Aetna's Administrative Record, stating:

> P2P: Peer-to-peer accomplished at 4:50 on 10/14/21; spoke with Dr. Smith. I advised him that this was denied as experimental and investigational for non-obese patients. He stated that this member has had 2 revisions of her fundoplication for hiatal hernia, the last one being done by himself. He noted that in patients who have more than 2 revisions, further fundoplications are almost certain to fail. He stated that a short limb Roux-en-Y then becomes the only successful way to repair the problem because a RYGB is impervious to recurrence of the hiatal hernia and substantially reduces the acid GERD which is so



symptomatic as well as being a greater risk for esophageal problems including cancer. This patient has significant esophagitis which has caused anemia to the extent of her having to be hospitalized. I asked if there was any other procedures [sic] available and he stated that the only other choice was to try a third repair, but he is essentially unwilling to try this as he feels that it exposes the patient to further risks associated with the surgery and probable re-herniation. **I stated that this would be best to go to appeal and explained the appeals process; I feel like there is a good chance of overturn of the denial on appeal and I strongly recommend that the denial is overturned.** He stated he would appeal and thanked me for the advice and time. (Richard Morgan, DO)  (Emphasis added.) (AR:038)

In a letter dated October 15, 2021, Plaintiff appealed the Claim Denial ("First Appeal").  (AR:259)  Dr. Smith submitted the First Appeal on Plaintiff's behalf.  In it, he stated:

[Plaintiff] has been suffering with severe reflux for 10 years and have [sic] been on PPI for the vast majority of those years. Over the last year, has had progressively worse abdominal pain and gas. Pain is constant, does not change with eating.
**At this time a Laparoscopic Roux-En-Y Gastric Bypass is indicated**. . . .
Prior to requesting this authorization, Eula Elazouzi has undergone a preoperative medical consultation, as well as thorough evidence-based reflux workup and is felt to be an acceptable surgical candidate. Upon workup of [her] GERD, an EGD has shown that [she] has documented severe reflux with and her UGI (XR) showed recurrence of her Hiatal Hernia.  Her endoscopy did present with a hill grade 4 diaphragmatic hiatus – thereby contributing to [her] reflux, and a 2 cm (likely sliding) hiatal hernia.
. . .
**It is my professional opinion that a Laparoscopic Roux-En-Y Gastric Bypass surgery is indicated in this case[,] and I believe that is the only option remaining for her reflux problems. I believe that failure to undergo this procedure will result in further deterioration of the patient's medical status and could lead to an early death.**  (Emphasis added.)  (AR:259-60)



With the First Appeal, Dr. Smith submitted medical research from peer-reviewed medical journals to document the fact that Plaintiff was a good candidate for this surgery and that it would alleviate her medical problems.  (AR:261-67)

On October 22, 2021, Heather Pankop, a nurse employed by Aetna, reviewed Dr. Morgan's summary of his peer-to-peer meeting with Dr. Smith.  (AR:240)  In response to Dr. Morgan's notes, she wrote:

> NCAU Recommendation: Question uphold of denial. The basis for this determination is per the CPB, Roux-en-Y gastric bypass as a treatment for gastroesophageal reflux in non-obese persons is considered experimental and investigational. However, **Dr. Morgan, Aetna MD, completed a peer to peer and noted in that discussion that he strongly recommended OT the appeal, however, chose not to do so himself. Defer to MD for final determination**.  (Emphasis added.)  (AR:240)

On October 25, 2021, Sarah Phillips, M.D. concluded that the First Appeal should be denied.  (AR:241)  She did not consult with Plaintiff's treating physicians. (AR:241)  Her reasoning was set forth in a letter dated October 27, 2021, wherein Aetna denied the First Appeal ("First Denial of Appeal").  (AR:558)  In the First Denial of Appeal, Aetna stated that:

> The basis for [its denial] is this member has gastroesophageal reflux disease (GERD). The member's body mass index (BMI) is 32. The member has failed conservative management with proton pump inhibitors (PPI's). An Esophagogastroduodenoscopy (EGD) was performed in August, which shows continued erosive duodenitis and erosive gastritis. This member has had repeated hiatal hernia repairs and fundoplication in the past. Roux-en-Y gastric bypass surgery is being requested due to this complicated presentation. Aetna allows for Roux-en-Y gastric bypass for gastroesophageal reflux disease in obese patients who have failed conservative management. However, the member does not have documented esophagitis and the hiatal hernia size is not described. A pH study has not been done. H. pylori testing was not provided. Additional consideration could be done on a second level appeal if additional clinical information is provided. Therefore, per the Clinical Policy Bulletin (CPB) on Obesity Surgery[, the denial of benefits] is upheld.  (AR:559)

-9-

There are multiple problems with this denial.  First and foremost, although the First Denial of Appeal states that "the hiatal hernia size is not described," **the size of the hiatal hernia _was_ described in the First Appeal.  It was stated as 2 cm.** (AR:259-60)  Second, while the First Denial of Appeal states that the "member does not have documented esophagitis," that assertion is incorrect.  Plaintiff's medical records from September 9, 2021 specifically state that her "Visit Diagnosis" was "Hiatal Hernia with GERD and esophagitis."  Apparently, Ms. Phillips failed to even examine Plaintiff's medical records. The items she claimed were missing had already been provided.  Of note, the claim was denied because required evidence of _medical necessity_ was allegedly missing.

In a letter dated November 9, 2021, Dr. Smith submitted Plaintiff's appeal of the First Denial of Appeal (the "Second Appeal").  (AR:110)  He explained that:

> At this time a Laparoscopic Roux-En-Y Gastric Bypass is indicated. This is because [of the] recurrence of yet another hiatal hernia.  In the future in the setting of Roux-en-Y gastric bypass will largely negate the reflux consequences, as only a small pouch of stomach will remain in continuity with the esophagus. **Roux[-en-Y gastric bypass] is the most impervious operation to recurrent hiatal hernia**, which the patient has now repeatedly proven her predilection for.
> Prior to requesting this authorization, Eula Elazouzi has undergone a preoperative medical consultation, as well as thorough evidence-based reflux workup and is felt to be an acceptable surgical candidate. Upon workup of [her] GERD, an EGD has shown that she has documented severe reflux with erosive esophagitis and gastritis of her fundo-plication which recently resulted in hospitalization for upper GI bleeding, thus a PH Impedance study was not performed. The size of hiatal hernia is undetermined due to the severe inflammation; it was difficult to determine size in EGD photos from August 2021. Ms. Elazouzi also has completed an H-Pylori test, that is negative.
> . . .
> **It is my professional opinion that a Laparoscopic Roux-En-Y Gastric Bypass surgery with concurrent re-repair of her hiatal hernia is indicated in this case, and the only prudent option remaining for her reflux problems**. I believe that failure to undergo this procedure will result in further deterioration of the patient's



1    **medical status, additional future surgery, and could lead to
     premature death.** . . . (AR:110-11)(Emphasis added).

2

3        On November 24, 2021, Lori Swenson, an Aetna employee of unknown

4    education, training, and experience, produced a "Specialist Determination."

5    (AR:244)  She did not consult with Plaintiff's treating physicians.  (*Id*.)  She stated:

6        Decision: uphold denial
         . . .

7        This decision is based on a review of the submitted information;
         previous denial information; Aetna's Clinical Policy Bulletin (CPB):

8        Obesity Surgery; and the member's insurance plan documents. The
         documentation provided indicates that the member has had gastro-

9        esophageal reflux disease (GERD) for approximately 10 Years. She has
         ongoing pain and symptoms despite medications and previous

10       surgeries. However, per the CPB, the requested procedure is considered
         experimental and investigational for treatment of persistent GERD

11       following antireflux surgery. The member's plan does not cover
         procedures that are considered to be experimental and investigational.

12       Therefore, the previous denial of coverage is upheld.  (AR:244)

13

14       In a letter dated November 24, 2021, Aetna denied the Second Appeal

15   ("Second Appeal Denial").  (AR:572)  The Second Appeal Denial explained that:

16

17       The basis for this determination is that the documentation provided
         indicates that the member has had gastroesophageal reflux disease

18       (GERD) for approximately ten years. She has ongoing pain and
         symptoms despite medications and previous surgeries. However, per

19       the CPB, the requested procedure is considered experimental and
         investigational for treatment of persistent GERD following antireflux

20       surgery. The member's plan does not cover procedures that are
         considered to be experimental and investigational. Therefore, the

21       previous denial of coverage is upheld.  (AR:573)

22

23

24       Of note, *Aetna's denial was no longer based on the procedure not being

25   medically necessary.*  The claim was denied because Aetna now classified it as

26   *experimental/investigational*.  Aetna had now switched the basis for denying the

27   claim on multiple occasions, while abandoning the previous decision's reasoning.

28



1    In a letter dated December 19, 2021, Plaintiff submitted a request for an

2  external review of the denials of her claim.  In it, she stated:

3       I am requesting an overturn of this denial as I can no longer tolerate the
        pain that I have in my stomach. I also continue to have unbearable
4       bloating and gas daily, also causing me shortness of breath and asthma
        on some days. . . . Denial of this surgery places me at a high risk of
5       additional esophageal problems including cancer. There is also a
        history of esophageal cancer in my family.
6
        . . .
7
        **At this time, I am asking that this denial be overturned, as there is
8       no other option available to me. Dr. Brian Smith also stated in his
        request to Aetna that a Roux-en-Y Bypass surgery is my ONLY
9       remaining option for my reflux problems, and [he] believes failure
        to undergo this procedure will result in further deterioration of my
10      medical status and could lead to an early death.**  (AR:1035-36)
        (Emphasis in original.)
11

12

13   On January 3, 2022, Independent Medical Expert Consulting Services

14  ("IMECS") affirmed Aetna's denial of Plaintiff's claim.  IMECS concluded that the

15  treatments that Plaintiff's doctors had prescribed were "experimental/

16  investigational."  (AR:424)  In their report, IMECS listed Plaintiff's diagnoses as:

17  "Diaphragmatic Hernia Without Obstruction Or Gangrene Gastro-esophageal

18  Reflux Disease Without Esophagitis."  (AR:425)  The report then explained:

19      The patient underwent evaluation for gastrointestinal bleeding in
        August 2021.  On 8/21/21 upper endoscopy showed severe
20      inflammation of the proximal stomach in the area of fundoplication,
        erosive gastritis, erosive duodenitis. The body of this report also
21      mentions mild esophagitis. The patient was on anticoagulant therapy at
        this time given her history of a brain aneurysm. The etiology of the
22      erosive gastritis and duodenitis is not apparent from the submitted
        material. This would not be an expected finding associated with GERD.
23      Additionally, conversion to roux en Y gastric bypass would complicate
        evaluation of the distal stomach and duodenum should she have
24      recurrent GI bleeding in the future. The patient does not have a
        recurrent hiatal hernia based on the submitted material and she does not
25      have confirmed pathologic esophageal acid exposure based on
        objective testing. The patient has not had a recent pH study. The
26

27

28



possibility of a slipped or malpositioned fundoplication has been considered. The UGI study performed by the consulting surgeon is reported to show a possible abnormality in the area of prior fundoplication. The patient has not had a contrast UGI study performed by a radiologist. If there is a malpositioned fundoplication, then isolated revision of the wrap would be a treatment option. The 2018 revisional operation was performed for the alternative condition of a recurrent hiatal hernia. Presently, the patient does not have a hiatal hernia.

Revision to Roux-en-Y gastric bypass is not an established therapy for this patient's condition of symptoms of GERD in the setting of a possible malpositioned fundoplication. Pathologic esophageal acid exposure is not confirmed based on the submitted material. The etiology of the August 2021 endoscopy findings is not clear (erosive gastritis and duodenitis) and should this condition recur, it would be difficult to evaluate/treat in the setting of gastric bypass anatomy.

No, the requested service is not a covered benefit under the terms of the plan. (AR:427-28)

The fact that Plaintiff has esophagitis and a hiatal hernia was never previously questioned by Aetna. Plaintiff's treating physicians made it clear that Plaintiff had a current and recurrent hiatal hernia, which was confirmed by testing. (AR:116) Yet the IMECS decision stated without explanation that she *did not have a hiatal hernia and as a result, Roux-en-Y gastric bypass was not an established therapy*. Aetna never gave Plaintiff a chance to respond to this opinion.

## 3.    AETNA IMPROPERLY DENIED PLAINTIFF'S CLAIM

### A.    Standard of Review

The parties agree that the proper standard of review is **de novo**. Under a de novo review, the Court undertakes an independent and thorough inspection of the administrative record without giving any deference to the insurer's findings, *Silver v. Executive Car*, 466 F.3d 727, 728, 733 (9th Cir. 2006), to freshly evaluate whether Aetna erred in denying Plaintiff's claim for medical benefits under the Policy, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).



**B.    Aetna Improperly Relied on the Experimental/Investigational Policy Exclusion**

    1)    The CPB Does Not Control, and Aetna Improperly Denied Plaintiff's Claim

Multiple specialists and Aetna's own doctor agreed that Plaintiff requires the treatment she seeks.  Aetna even acknowledged that her treatment is medically necessary when, during the final denial of appeal, when it dropped its reliance on the medical necessity exclusion and used as the sole basis of its denial that the treatment was experimental/investigational.  Given that her condition is so severe that it has caused her to be hospitalized and that Aetna's own doctor conceded the procedure was medically necessary and was not investigational, it is clear that she requires this non-investigational treatment.  During the administrative process, Aetna insisted that the CPB's **exclusion** controls and that, per the CPB, the treatment was experimental/investigational.  Aetna is incorrect.[3]  The CPB does not control and the treatment is not experimental/investigational.  The Plan states:

> **Experimental or investigational**
> . . . A drug, device, procedure, or treatment is experimental or investigational if:
>> • There is not enough outcome data available from controlled clinical trials published in the peer reviewed literature to validate its safety and effectiveness for the illness or injury involved.
>> • The needed approval by the FDA has not been given for marketing.
>> • A national medical or dental society or regulatory agency has stated in writing that it is experimental or investigational or suitable mainly for research purposes.
>> • It is the subject of a Phase I, Phase II or the experimental or research arm of a Phase III clinical trial.  These terms have the meanings given by regulations and other official actions and

---

[3] Aetna has the burden to establish that an exclusion applies.  *See Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018).





publications of the FDA and Department of Health and Human Services.
• Written protocols or a written consent form used by a facility provider state that it is experimental or investigational.  (AR:540)

**Medically necessary, medical necessity**
Health care services that we determine a provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease or its symptoms, and that we determine are:
. . .

   • ***Following the standards set forth in our clinical policies and applying clinical judgment*** (Emphasis altered.)  (AR:541)

An examination of the above language makes clear that the CPB is incorporated into the Plan for issues of *medical necessity and that the language of incorporation is* **not** *present in the section addressing matters that are "experimental or investigational*."  Aetna could have easily included language incorporating the CPB into all aspects of the claims process, but it did not.  As such, the CPB is not incorporated into the Plan documents for purposes of Aetna's claim denial.

In *Dick*, *supra*, the court encountered a very similar situation.  Susan Dick requested medical care under a group health policy.  Like the CPB here, the insurer issued a similar bulletin called a "Medical Policy" that it relied on for coverage decisions.  Under the Medical Policy, the treatment that Ms. Dick sought was labeled as experimental or investigational.  The insurer denied the claim.  *See* 2023 WL 2071523, at **1-3.    The district court ruled that the insurer had abused its discretion.  It explained that:

As noted above, Deseret Mutual relied exclusively on the Medical Policy to deny benefits. DMBA 00332. This was an abuse of discretion. The Medical Policy was not a Plan document, and there was no silence or ambiguity within the Plan that would have permitted Deseret Mutual to rely on the Medical Policy as the basis for its denial. Further, Deseret Mutual failed to provide a basis for its denial that is supported by the plain language of the Plan. Thus, Deseret Mutual's reliance on the



1    Medical Policy as the sole basis to deny Ms. Dick coverage conflicts
2    with the plain language of the Plan and was an abuse of discretion.
     . . .
3    To begin with, this Court rejects Deseret Mutual's argument that the
4    Medical Policy was part of the Plan. The Medical Policy explicitly
     states that it is not part of the ERISA Plan, nor is it a contract. DMBA
5    00843 (stating Deseret Mutual's Medical Policy is not the ERISA Plan
6    nor is it a contract; it is offered only for informational purposes, can be
     updated at any time, and if it conflicts with the Plan, the Plan controls).
7    Moreover, if Deseret Mutual had intended for the Medical Policy to
8    define the types of brachytherapy that are covered versus excluded
     expenses, it could have referred to the Medical Policy in the Plan as it
9    did in other sections. Finally, Ms. Dick was not provided the Medical
10   Policy throughout the entire administrative process. DMBA 00881,
     0089 (stating Deseret Mutual had a policy not to give out copies of the
11   Medical Policy).

12   *Id.* at **4-5, 5 n. 5.

13          The district court further noted that "Even if the Medical Policy were a plan

14   document, Deseret Mutual could still only exclude coverage based on this policy if

15   the Master Plan Document's provision did not unambiguously cover the procedure."

16   *Id.*  The court concluded that the Plan was not ambiguous and, therefore, denying

17   the claim based on the Medical Policy was an abuse of discretion.  *See id.* at *6.

18   The insurer also argued that the treatment was experimental or investigational under

19   the terms of the plan document.  However, as the district court explained, "because

20   Deseret Mutual did not rely on this basis [of] denial in the administrative

21   proceedings, it cannot do so here."  *Id.*  During the appeals process, the insurer had

22   "provided no explanation as to why Ms. Dick's treatment was Investigational/

23   Experimental, and instead relied solely on the Medical Policy. . . ."  *Id.*  The insurer

24   could not raise the new basis for denial at trial.  *See id.*  The insurer had abused its

25   discretion in denying the claim.  *See id.*

26          Here, the circumstances are largely identical to those faced by the *Dick*

27   court. As an initial matter, the CPB explicitly applies to multiple Aetna plans. ("Most

28



1    Aetna HMA and QPOS plans exclude coverage of surgical operations, procedures or

2    treatments of obesity unless approved by Aetna.").  (AR:584)  The CPB is

3    referenced to varying degrees by many plans.  The language incorporating the CPB

4    into the Plan was under the medical necessity section and a provision addressing

5    medications.  Conversely, *nothing incorporates the CPB into the section of the Plan*

6    *that addresses experimental or investigative claims*.  Again, this is similar to *Dick* in

7    that the key provision of the plan did not incorporate the CPB/Medical Policy.

8    Thus, any definition in the CPB that addresses *experimental or investigative claims*

9    *is not part of the Plan and does not control.*

10          As for a failure to provide an explanation as to why a procedure was

11   classified as experimental, Aetna's final denial of appeal stated:

12          The basis for this determination is that the documentation provided
13          indicates that the member has had gastroesophageal reflux disease
             (GERD) for approximately ten years. She has ongoing pain and
14          symptoms despite medications and previous surgeries. However, per
             the CPB, the requested procedure is considered experimental and
15          investigational for treatment of persistent GERD following antireflux
             surgery. The member's plan does not cover procedures that are
16          considered to be experimental and investigational. Therefore, the
             previous denial of coverage is upheld.
17

18          Aetna failed to provide any explanation whatsoever as to why the treatment

19   was considered to be experimental or investigational.  Although the final denial

20   letter provided a link to obtain a copy of the CPB via the Internet, as explained

21   above, as it relates to *experimental or investigative claims*, the CPB is not a Plan

22   document and cannot control the question as to whether Plaintiff's claim is excluded

23   by the CBP.   Moreover, even if the CPB did apply (it did not), the information in

24   the letter was incomplete as to how to obtain the relevant clinical policy bulletin or

25   which portion of the **155-page document** applied to the claim.  In fact, entering the

26   information provided by Aetna into its Website produced two different potential

27   clinical policy bulletins that could have contained the operative information.  As

28

1  such, Aetna failed to provide Plaintiff with a copy of the CPB.  The current

2  circumstances mirror those in *Dick*.  Here, the CPB is not incorporated into the

3  Plan's definition of experimental/investigational.  Aetna erred by relying on it as the

4  sole basis for denying the claim.  *See id*.  Aetna improperly denied Plaintiff's claim

5  for benefits.

6        Even if the CPB was incorporated (which it was not), one still examines the

7  main Plan document and, if it is unambiguous, then the CPB would not control.  *See*

8  *id*. at **3-4.  Here, the Plan terms are unambiguous.  The Plan states:

9      **Experimental or investigational**

10     Drugs, treatments or tests not yet accepted by **physicians** or by
       insurance plans as standard treatment. They may not be proven as
11     effective or safe for most people.  A drug, device, procedure, or
       treatment is **experimental or investigational** if:
12

13     • There is not enough outcome data available from controlled clinical
       trials published in the peer reviewed literature to validate its safety and
14     effectiveness for the illness or injury involved.

15     • The needed approval by the FDA has not been given for marketing.

16     • A national medical or dental society or regulatory agency has stated in
       writing that it is **experimental or investigational** or suitable mainly for
17     research purposes.

18     • It is the subject of a Phase I, Phase II or the experimental or research
       arm of a Phase III clinical trial. These terms have the meanings given
19     by regulations and other official actions and publications of the FDA
       and Department of Health and Human Services.
20

21     • Written protocols or a written consent form used by a facility
       **provider** state that it is **experimental or investigational."**
22

23       Thus, for Aetna to properly rely on its exclusion, it would have the burden of

24  proof to establish the treatment in question is subject to one or more of the

25  restricting criteria above.  While Aenta did cite to this language in its Second

26  Appeal Denial (AR:572), it did not attempt to establish that any one of the

27  restricting criteria above applied.  This was for good reason: none applied.  The first

28  restricting criteria is that "There is not enough outcome data available from



1   controlled clinical trials published in the peer reviewed literature to validate its

2   safety and effectiveness for the illness or injury involved." Here, there is more than

3   sufficient data. Plaintiff's treating physician sent samples of various clinical studies

4   that established this. (AR:261-67) Furthermore, the only portion of Aetna's CPB

5   that addresses conditions like Plaintiff's cites three cases that all support the position

6   that, in this context, the Roux-en-Y has "a high rate of success, making this

7   approach an important option in the properly selected patient." (AR:0690) The

8   relevant studies provide support for her requested treatment.

9       As for the second and fourth criteria – pending FDA approval and the

10  treatment still being subject to Phase trials – they too fail to establish that the

11  exception to coverage applies. Roux-en-Y has been approved by the FDA for over

12  20 years. *See E.L. v. Scottsdale Healthcare Corp. Health Plan*, 2011 WL 3489644,

13  at *2 (D. Az. 2011) (noting that Medicare covered Roux-en-Y surgery as early as

14  1996 as a medically necessary procedure to remedy various health conditions). The

15  FDA approved the procedure in 2001. Benjamin G. Mitchell and Nishant Gupta,

16  *Roux-en-Y Gastric Bypass*, U.S. Dept. of Health and Human Services (Apr. 3, 2023,

17  10:19 AM), pubmed.ncbi.nlm.nih.gov/31985950 (Roux-en-Y "accounted for over

18  60 to 70% of all bariatric operations in the United States since 2003.").

19      As for the third criteria – "A national medical or dental society or regulatory

20  agency has stated in writing that it is **experimental or investigational** or suitable

21  mainly for research purposes" – Plaintiff and her counsel have been unable to locate

22  any organization that has stated this with respect to Roux-en-Y. During the

23  administrative process and in this litigation, Aetna has failed to provide any

24  evidence showing that this criterion applies.

25      The fifth criteria – "Written protocols or a written consent form used by a

26  facility **provider** state that it is **experimental or investigational**" – also does not

27  apply. In fact, Plaintiff's treating physicians argued at length that Roux-en-Y was a

28  normal, commonly used and proper procedure.



The IMECS decision does not alter the analysis. The IMECS based its decision on medical facts that Aetna did not challenge: Plaintiff's esophagitis and hiatal hernia. Dr. Smith made it clear that testing had revealed that Plaintiff had a "current" and "recurrent" hiatal hernia. Yet the IMECS decision stated that she did not have a hiatal hernia, with no explanation as to how or why the IMECS reached this conclusion. The IMECS opinion relies on entirely new and speculative arguments against a diagnosis that Aetna and Plaintiff's doctors had determined was accurate. Furthermore, it did not address any of the Plan's criteria. The medical evidence, and Aetna's own doctors' failure to challenge the diagnosis in the final denial of appeal, establishes that the IMECS position is not persuasive.

Finally, Aetna should not be allowed to renew the position that the treatment is not medically necessary after abandoning it during the administrative process. *See Dick*, 2023 WL 2071523, at **4-6. Even if Aetna were allowed to resuscitate the argument, it would still fail. The criteria of medical necessity are clear, (AR:541), and the CPB is only consulted if they are unclear, *see id*. Aetna failed to produce evidence that any of the Plan's limiting criteria apply. Nothing in the administrative record shows that the treatment is not in accordance with generally accepted standards of medical practice; is clinically inappropriate; is primarily for the convenience of the patient or physician; is more costly than an alternative service at least as likely to produce equivalent therapeutic or diagnostic results as that prescribed; or is contrary to medical standards that are based on credible scientific evidence published in peer-reviewed medical literature. Its own doctor conceded the treatment is medically necessary and urged that Aetna overturn its denial. This Court should overturn Aetna's denial.

2)   Aetna Did Not Fairly Engage With Plaintiff's Doctors and Did Not Engage in a Meaningful Dialogue With Plaintiff

Aetna consistently failed to engage with Plaintiff's doctors and refused to heed its own doctor. The only physician for Aetna who actually spoke with



1  Plaintiff's doctor's **recommended that the procedure be approved**.  Multiple

2  physicians treating Plaintiff and Aetna's own doctor agree that the treatment is

3  required.  Aetna erred in denying the claim.

4  When Dr. Morgan (Aetna's own peer-review doctor) contacted Plaintiff's

5  treating physician, he learned of the reality of Plaintiff's motivations and condition.

6  He agreed with Plaintiff's treating physicians.  (AR:038)  ("I strongly recommend

7  that the denial is overturned.")  However, Aetna refused to heed its own doctor.

8  This is incredibly powerful evidence of Aetna's bad faith in this matter.  *See Evans*

9  *v. Sun Life & Health Ins. Co.*, 601 F.App'x 497, 498 (9th Cir. 2015) (noting that

10  acting contrary to the opinion of its own physician was a clear sign that an insurer

11  had abused its discretion).

12  Aetna's other physicians simply looked at a guideline and never truly

13  considered Plaintiff's condition or circumstances.  They performed cursory

14  examinations of records and failed to notice that the information that they insisted

15  was missing had actually been provided.  They failed to even speak with Plaintiff's

16  treating physicians.  They insisted that the CPB stated that the treatment was

17  experimental/investigational when, in fact, the studies in their CPB noted that the

18  treatment was a commonly prescribed treatment for Plaintiff's condition.  They did

19  not engage with Plaintiff's treating physicians.

20  Conduct analogous to Aetna's was recently addressed by the Tenth Circuit.

21  *See D.K. v. United Behavioral Health*, --- F.4th---, 2023 WL 3443353 (10th Cir.

22  2023).  In *D.K.*, the claimant was a suicidal youth who required intensive psychiatric

23  care.  The relevant insurer, United, only paid for very limited periods of intensive

24  coverage.  Each time the insurer stopped paying for coverage, the insured quickly

25  relapsed.  The insurer discounted the opinions of the insured's physicians,

26  misclassified the nature of care sought, constantly shifted the basis of denial, and, in

27  the denial letters, failed to provide a reasoned analysis.  The district court found that

28  the insurer had abused its discretion for each of those reasons.  *See id.* at *1-7.



The Tenth Circuit upheld the district court's decision because "United did not fairly engage with the medical opinions of A.K.'s treating professionals . . . [and] United's denials did not contain reasoned analysis or specific citations to the medical record. . . ." *Id*. at *6. The Tenth Circuit "declined to consider" the other bases of the district court's reasoning. *Id*. at *6 n. 5. It explained that the insurer needed to actively engage with and consider the opinions of the treating physicians. It further explained that such consideration had to be documented in the actual denial letters, not just internal notes. *See id*. at **10-12. The insurer had failed to meet that standard. S*ee id*. at *12.

The Tenth Circuit then addressed the insurer's "sufficiency of explanation." The insurer had only provided blanket statements that the level of care was not covered by the Policy. *See id*. at **12-13. The Tenth Circuit explained that the insurer had abused its discretion by not explaining what medical records or information supported its decision. *See id*. The Court explained that "[its] conclusion that ERISA regulations require denial letters themselves to be comprehensive, 29 C.F.R. § 2560.503-1(f)(3); 29 C.F.R. § 2560.503-1(h)(3), (4), in order to form a 'meaningful dialogue' for a full and fair review [citation omitted]. Review of the explanation provided to claimants must focus on the content of the denial letters."

Aetna engaged in the same conduct as the insurer in *D.K.* In both cases, the insurer failed to engage with the medical professionals who were treating the claimant. Here, **the only doctor to have done so, Dr. Morgan, specifically recommended the procedure and that Aetna overturn its denial**. Furthermore, the final denial of appeal did not even cite a specific medical record or say which portion of the CPB was relevant. This was highly improper and further highlight's Aetna's error in denying the claim. *See generally id*. Because Aetna did not cite to the medical record or give any explanation as to why its exclusion applied, it failed to conduct a full and fair review and engage in a meaningful dialogue.

3)    <u>Aetna Consistently and Improperly Changed Its Basis for Denying the Claim</u>

A significant problem with Aetna's claim denial is that at each layer of the administrative process, Aetna changed the denial's basis.  Aetna originally denied the claim because the treatment allegedly was both experimental/investigational and medically unnecessary for **weight loss**.  Aetna then denied the claim based on an alleged lack of medical evidence.  Finally, it denied the claim because it asserted that the treatment was experimental/investigational as to Plaintiff's GERD and hiatal hernia.  When IMECS upheld the denial, it was upheld for a completely different reason: the belief that Plaintiff did not even suffer from the medical conditions that Aetna and Plaintiff's treating physicians both agreed she *did* suffer from.  This constant changing of Aetna's basis for denying the claim was highly improper.

"When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures." *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 974 (9th Cir. 2006); *Collier*, 53 F.4th 1180; *D.K.*, , 2021 WL 2554109, at *13 ("[T]he court finds that the Defendants' shifting and inconsistent denial rationale is arbitrary and capricious."); *Metaxas*, 2022 WL 3702099, at *15.  "An administrator must provide a plan participant with adequate notice of the reasons for denial and provide a 'full and fair review' of the participant's claim." *Metaxas*, 2022 WL 3702099, at *15.

Courts are critical of administrators, like Aetna, who change the basis of denial.  In *Metaxas*, *supra*, the court found in favor of a claimant who sought employment termination benefits.  The *Metaxas* court ruled against the claims administrator, the Appeal Committee ("AC").  The AC constantly changed the basis of its denial.  The *Metaxas* court ruled against the AC for a variety of reasons, including the constantly changing basis of denial.  The court explained:

> Here, the Appeal Committee did not just "tack[ ] on a new reason for denying benefits in a final decision," *id.*, it completely reversed the



finding of the Initial Claim Committee (that Plaintiff was not terminated by [the employer], rather, she resigned), abandoned the *only* reason articulated by the Initial Claim Committee for denying Plaintiff's termination benefits (that Plaintiff experienced a "change in employment status"), and relied on this new reason (that Plaintiff was terminated for cause) as the *sole basis* for its denial of Plaintiff's claim for termination benefits. Here, then, the Appeal Committee's substantial procedural violations undermining Plaintiff's right to a full and fair review of her claim, "insulating the rationale from review," and "contraven[ing] the purpose of ERISA," weigh heavily against Defendants.

*Id.* The *Metaxas* court remanded the matter for further deliberations by the AC. Here, Aetna engaged in the same conduct as the *Metaxas* AC. Each level of denial abandoned the previous level's findings and/or basis for denial. The claim was denied as a weight-loss claim. It then was denied due to a contended lack of evidence of medical necessity as to her actual conditions (GERD and hiatal hernia). The final denial simply asserted that the treatment sought was experimental/investigational. Each time, Aetna changed the basis of denial.

IMECS's decision provided yet another completely different basis to deny the claim. IMECS made its determination based on the conclusion that both Plaintiff's treating physicians and Aetna had erred in their diagnosis. Plaintiff never had an opportunity to respond to this position, either.

The reasoning in *Collier, supra,* also readily applies to this matter. In *Collier*, the insurer denied a claim for long-term disability ("LTD") benefits on the basis that the claimant "did not meet the definition of disability." *Id.* at 1187. The claimant sued, and the district court ruled in favor of the insurer. *See id.* at 1184. However, the district court ruled on the basis that the claimant allegedly was not credible. *See id.* The Ninth Circuit overturned the decision stating:

We have recognized that a plan administrator undermines ERISA and its implementing regulations when it presents a new rationale to the district court that was not presented to the claimant as a specific reason for denying benefits during the administrative process. We have



expressed disapproval of post hoc arguments advanced by a plan administrator for the first time in litigation. For instance, in *Harlick v. Blue Shield of California*, we held that "[a] plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding." This rule allows the claimant to prepare for further administrative review and future litigation, prevents the claimant from being "sandbagged" after litigation has commenced, and disallows the plan administrator from initiating "a new round of review." . . .

Collier maintains that the district court violated this rule when it relied on rationales that Lincoln did not raise as grounds for denying her claim for benefits. We agree.

*Id*. at 1186-87 (internal citations omitted).

Here, although the additional basis for denial was not presented during litigation, it was presented by Aetna or IMECS after Plaintiff had an opportunity to respond. They attempted to "sandbag" Plaintiff. Ultimately, Aetna and IMECS consistently changed the basis of the claim denial. This was highly improper and further evidence Aetna did not deny the claim in good faith.

## 4.    <u>CONCLUSION</u>

For the above-stated reasons, this Court should find that Aetna improperly denied the claim, and grant judgment in Plaintiff's favor.

Dated:  June 2, 2023               McKENNON LAW GROUP PC


By: _____
ROBERT J. McKENNON
NICHOLAS A. WEST
Attorneys for Plaintiff, Eula Elazouzi

Case No.: 5:22-CV-00858-JGB (SPx)



## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on June 2, 2023, I served the foregoing documents described as: PLAINTIFF EULA ELAZOUZI'S OPENING TRIAL BRIEF on the interested parties as follows:

COURTNEY C. HILL

cchill@grsm.com

GORDON REES SCULLY MANSUKHANI, LLP

633 West Fifth Street, 52nd floor

Los Angeles, CA 90071

Telephone: (213) 576-5088

Facsimile: (213) 680-4470

Attorneys for Defendant Aetna Life Insurance Company

☒ ECF Participant

☒ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System. I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business. The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct. Executed at Newport Beach, California on June 2, 2023.

NAME: _____*Debi Cartee*_____
(Signature)